## DRURY *v.* ARMOUR & COMPANY.

### Opinion delivered November 3, 1919.

1. SALES—DAMAGE TO CONSUMER—PURCHASE THROUGH INTERMEDIARY—CAVEAT EMPTOR.—In the sale of provisions by one dealer to another in the course of general commercial transactions, the maxim *caveat emptor* applies, and there is no implied warranty or representation of quality or fitness.

2. SALES — MANUFACTURER, TO DEALER TO CONSUMER — DAMAGES TO CONSUMER.—Where a manufacturer sold sausages to a dealer who sold the same to plaintiff, and plaintiff's wife died as a result of eating said sausages, plaintiff can not maintain an action against the manufacturer on a warranty of wholesomeness of the sausages and for a breach thereof.

3. SAME—SAME—SAME—NEGLIGENCE IN PREPARATION.—But there is a cause of action in favor of the ultimate consumer against the manufacturer upon allegations and proof of negligence in the preparation of the sausages or other foods.

4. NEGLIGENCE—SALE OF FOOD—PTOMAINE POISONING AND DEATH.— Appellant purchased bologna sausage from a retail dealer who had purchased same from appellee, the manufacturer. Through the evidence was not certain, it appeared that appellant's wife ate some of the sausage, was shortly thereafter stricken with ptomaine poisoning, and died. In an action against the manufacturer by appellant, there was sufficient evidence to warrant a submission to the jury of the question of negligence in the manufacture of the sausage.

Appeal from White Circuit Court; *J. M. Jackson,* Judge; reversed.

*Brundidge & Neelly* and *J. J. McKay,* for appellant.

1. The court erred in compelling plaintiff to elect, as plaintiff had the right of action on both causes or either of them.

2. Plaintiff's testimony makes a full and complete cause of action for negligence on part of defendant company in the preparation or inspection of its food products. 76 Ark. 352; 114 *Id.* 145.

3. It was error to take the case from the jury, as negligence was proved. 200 Fed. 322; 247 *Id.* 921; 96 Mich. 245; 55 N. W. 812; 21 L. R. A. 139; 93 Kan. 334; 144 Pac. 334; L. R. A. 1915 C. 179; 120 Fed. 865-870; 57 Am. Dec. 455; 135 Mich. 57; 97 N. W. 152; 63 L. R. A. 743; 106 Am. St. 384; 19 L. R. A. (N. S.) 923; 57 Ark. 435; 86 *Id.* 81; 20 R. C. L. 590. *Res ipsa loquitur. Ib.* 590 (b); Ann. Cases 1916 C. 122; 57 Am. Dec. 455; 83 Ga. 457; 10 S. E. 118; 20 Am. St. 324; 5 L. R. A. 612; 33 Wash. 87; 73 Pac. 797; 99 Am. St. 932; 229 Fed. 230; 19 L. R. A. (N. S.) 923. The evidence presented a case for a jury. *Supra.*

*Cul L. Pearce* and *Rose, Hemingway, Cantrell & Loughborough,* for appellee.

1. Defendant's motion to require plaintiff to elect was properly sustained. 124 Ark. 206; 69 *Id.* 209; 58 *Id.* 140; 32 Harvard Law Rev. 71.

2. There was no privity of contract and a suit on an implied warranty would not lie. 207 S. W. 62; 76 Ark. 352-355.

3. No negligence being shown, a peremptory instruction was correct. 76 Ark. 352; 139 Wis. 357; 23 L. R. A. N. S.) 876; 120 Fed. 865; 61 L. R. A. 303; 114 Ark. 140; 207 S. W. 58-63; 247 Fed. 921-931; 105 Atl. 55.

4. There was no evidence of negligence to warrant a recovery and no case for a jury. *Supra.* 11 Ark. 212, 235-6; 1 Thompson on Negl., § 403; 108 Pac. 101; 200 U. S. 484; 2 Chamberlayne on Mod. Law of Ev., § 1029. See also 47 N. E. 971; 88 *Id.* 71-73.

5. The doctrine of *res ipsa loquitur* has no place here. 8 Enc. of Ev. 872, 874; 89 Ark. 581-588; 75 *Id.* 491; 121 *Id.* 351-6; 4 Wigmore on Ev., § 2509 (3); 29 Cyc. 591-2; Wigmore on Ev., § 2509; 1 Thomps. on Neg., § 15; 6 *Id.* 7635-6; 59 Atl. 923; 70 S. W. 376; 84 S. E. 893-5; 106 N. E. 367; 114 S. W. 658; 64 S. E. 93-97-8; 127 S. W. 397; 98 N. E. 975; 66 S. E. 135; 119 Fed. 572; 112 N. E. 1025; 61 S. E. 745; 92 Pac. 40; 81 N. W. 397; 84 *Id.* 860; 166 Fed. 651; 102 N. W. 258-260; 114 Ark. 140; 100 N. E. 1978, etc.

McCULLOCH, C. J. Minnie Drury, the wife of appellant, died on March 23, 1918, and appellant instituted this action against appellee to recover damages accruing by reason of the death of his wife, which is alleged to have resulted from eating poisoned sausage prepared and sold by appellee. It is alleged in the complaint that appellee prepared the sausage for sale by retail dealers for immediate consumption, and that appellee "maintains a place of business in Helena, Arkansas, and other towns in said State, representing and holding out to the general public that its goods are wholesome, pure and fit for food." It is further alleged in the complaint that appellee "was guilty of negligence in manufacturing and preparing said sausage so purchased in that the same contained a nauseating poisonous substance." Appellant sues in his own right for damages sustained by him on account of the death of his wife, and also sues as administrator of his wife's estate.

Appellee filed a motion to require plaintiff to elect whether he would prosecute the action upon the alleged breach of implied warranty or on the allegation of negligence in the preparation of the sausage. The court sustained the motion, over appellant's objection, and he thereupon elected to try the case on the allegation of negligence contained in the complaint. Appellee answered, denying that it was guilty of negligence in preparing the sausage and denied that the sausage contained any poisonous substance, or that Minnie Drury was made

sick or died from eating the sausage. The case proceeded to trial before a jury, but at the conclusion of appellant's introduction of testimony the court gave a peremptory instruction in favor of appellee, and judgment was rendered accordingly in appellee's favor.

(1-2) It is contended, in the first place, that the court erred in requiring appellant to make an election as to the cause of action in the complaint he would stand upon. It is argued that notwithstanding the fact set forth in the complaint that the sausage was not purchased by the consumer directly from appellee, but through an intermediate retail dealer, there was a warranty of the wholesomeness of the food product, and that plaintiff could maintain an action for the damages resulting from a breach of the warranty. This question is decided against appellant's contention in the case of *Nelson* v. *Armour Packing Co.*, 76 Ark. 352, where Judge BATTLE, speaking for the court, said: "In the sale of provisions by one dealer to another in the course of general commercial transactions, the maxim *caveat emptor* applies, and there is no implied warranty or representation of quality or fitness." Liability was denied in that case on the ground that "there was no privity of contract between appellant and appellee, and no warranty passed with the property from appellee to appellant through his vendor." The doctrine of that case has been aproved by this court in *Colyar* v. *Little Rock Bottling Works*, 114 Ark. 140, and *Heinemann* v. *Barfield*, 136 Ark. 500. We adhere to the doctrine now and treat the question as settled.

(3) The complaint in the case of *Nelson* v. *Armour Packing Company, supra*, contained an allegation of negligence, but the subject was not treated in the opinion, which dealt solely with the question of the plaintiff's right of action on a breach of implied contract of warranty. In the later cases, cited above, we held that there is a right of action in favor of the ultimate consumer under such circumstances against the manufacturer upon allegations and proof of negligence in the preparation of foods, this being upon the theory that where food prod-

ucts are prepared by a manufacturer for sale to retail dealers for consumption by the ultimate purchaser, it is to be reasonably anticipated that injury will result to the consumer from the use of the unwholesome food thus placed on the market. Many of the cases cited on the brief of counsel for appellant sustain that view. *Salmon* v. *Libby*, 219 Ill. 421; *Park* v. *Yost Pie Co.*, 93 Kan. 334; *Tomlinson* v. *Armour & Co.*, 75 N. J. L. 748; 19 L. R. A. (N. S.), 923; *Craft* v. *Parker*, 96 Mich. 245; *Haley* v. *Swift*, 102 Wis. 570; *Wilson* v. *Ferguson*, 214 Mass. 265, 101 N. E. 381. The court did not err in requiring the election.

(4) The remaining question for our consideration is whether or not there was evidence legally sufficient to go to the jury as to the cause of Mrs. Drury's sickness and death, and on the charge of negligence against appellee in preparing the sausage and putting it on the market for purchase by consumers. Appellee maintained a place of business at Helena, Arkansas, for distribution of its food products throughout the adjacent commercial territory, and the sausage alleged to have been eaten by Mrs. Drury came from that place of business maintained by appellee, who sold it to C. M. Parham, a retail merchant at Bald Knob, Arkansas, who in turn sold it to appellant for family consumption.

Appellant resided with his family at a lumber camp a few miles distant from Bald Knob and on Saturday, March 23, 1918, he purchased from Parham several articles of food, including two sticks of bologna sausage, each weighing about four and one-half pounds. The purchase was made for appellant by Mr. Bridgeman, one of his neighbors, who returned from Bald Knob with the purchased foodstuffs about 8 o'clock on the evening of the day mentioned. When the bill of goods was being purchased from Parham, Bridgeman called for the sausage and was informed by Parham that he had none in stock, but that there was a consignment due, which was perhaps then at the railroad station, and he sent down to the station and the box containing the sausage was

brought to the store and opened in Bridgeman's presence. The box contained four sticks of equal size and weight, two of which were, as before stated, sold to Bridgeman for appellant.

When Bridgeman delivered the goods to appellant, the latter's family had eaten the evening meal about 6 o'clock, which, according to the testimony, consisted of fried potatoes, rice, bread, coffee, mince pie and home-grown strawberries and apple butter. Appellant and his wife had two children, the oldest about seven years old, and the whole family partook of all of the above mentioned articles at the evening meal. Mrs. Drury became ill about 10:30 o'clock that night and began vomiting about 1 o'clock and continued ill until the following Sunday, when she died. She was treated by a physician during her illness and the physican testified as a witness in the case.

There is no direct testimony that Mrs. Drury ate any of the sausage, but there are circumstances relied on by appellant as sufficient to establish that fact. There was no one in the house that night except appellant and his family, and he testified that the next morning when he went out to prepare breakfast for himself and children he found that one of the sticks of sausage had been cut through and a portion of the meat had been used, and he also testified that after his wife began vomiting he examined the discharge in the bucket in which she vomited and saw particles which he identified as undigested bits of the sausage. He testified that he cooked some of the sausage for breakfast the next morning which was eaten by himself and children and also for dinner, and that none of them became sick. He testified that when he began the preparation of the meal the next day he cut some of the sausage from one of the severed parts of the stick found in the kitchen, and when he cut into it he discovered "a green, slimy piece about as big as your thumb," which was wet and soggy, and that there was a bad odor from it.

The physician who attended Mrs. Drury testified that her illness resulted from ptomaine poisoning. Other physicians testified as experts, and their testimony tended to show that Mrs. Drury's illness and death was caused by ptomaine poisoning.

It is earnestly and very forcefully argued by counsel for appellee that the proof falls short of establishing either the fact that Mrs. Drury ate the sausage and was poisoned on account of it, or that appellee was guilty of negligence in the preparation and handling of the sausage, but we are of the opinion that the testimony, when analyzed and given its strongest probative force, is sufficient to warrant a submission of the issues to the jury. It is argued that, notwithstanding appellant's testimony that he discovered bits of the sausage in the vomit discharged by his wife from her stomach, this could not be true for the reason that sausage being made of ground meat, it could not be identified in a mass of other matter which came from the stomach. This is indeed a strong argument against the truth of appellant's testimony, but it can not be said as a matter of law that the testimony is irreconcilably in conflict with the physical fact, and must be wholly disregarded as untrue. It may seem improbable that there was an identification of the bits of sausage in the vomit, and yet it might be true; at least, it can not be said that the witness stated an impossibility.

The testimony warrants a conclusion that the sausage was eaten, if at all, at least two hours after any other food was taken into the stomach, and, while we know that sausage is made of ground meat, it is compressed into a compact mass, and when it has not been properly masticated and remains undigested in the stomach, it might be identified. At least, we can not say that it is absolutely impossible to identify it under those circumstances. There are other circumstances tending to show that Mrs. Drury ate some of the sausage that night.

It was according to the testimony, eaten by some one, and there was no one else in the house to get it except appellant and one of the small children. The testimony of

appellant also was sufficient to warrant a finding that the sausage contained a poison and the testimony of the attending physician and other experts tended to establish the fact that this caused Mrs. Drury's sickness and death. Ptomaine is a putrefactive alkaloid generally found in the form of malignant poison in canned meats or fish, and sometimes found in less harmful form in preserved vegetable matter. The testimony of the experts is to the effect that the poison in preserved meats results either from the diseased condition of the slaughtered animal caused by the bacteria in the live animal or resulting from the improper preparation or handling of the meat. One of the witnesses, Doctor Pace, states in his testimony that the diseased condition of the animal which caused putrefaction could be detected by proper inspection, and that the bacteria which produced the alkaloid could not get into preserved meat if properly prepared and handled.

We think the testimony as a whole is sufficient to warrant a submission of the question of negligence to the jury. This is not building a presumption or an inference of fact upon a presumption, but the circumstances are such as fairly warrant the inference that Mrs. Drury ate the sausage, that the sausage contained a poison, and that it caused her sickness and death, and that appellee was negligent either in failing to discover the disease which produced the poisonous alkaloid or in failing to properly prepare or handle the meat, thereby causing it to become a poisonous substance.

The proof practically excluded any idea of the meat becoming contaminated after it left the possession of appellee. It was received by the local dealer from the public carrier and taken from the original package on the day it was eaten by Mrs. Drury, and then contained a poisonous substance.

These facts are established, not by positive testimony, but by proof of circumstances which fairly and reasonably warrant this inference. These facts then being established by circumstantial proof and not merely by in-

dulging presumptions, a state of facts is established which warrants a further inference that appellee was negligent either in failing to discover the diseased condition of the slaughtered animal from which the meat was taken or in failing to properly prepare the meat and handle it. In other words, we have presented a chain of circumstances which show that Mrs. Drury's illness was caused from eating sausage; that the sausage remained in the control of appellee up to a short space of time before it was consumed by Mrs. Drury, the proof excluding any probability of it having become contaminated after it left the hands of appellee, and that the presence of the poisonous substance in the sausage could not have occurred in the ordinary course of things if appellee had exercised proper care in its preparation.

Appellee's method of slaughtering animals and preparing and packing meat for distribution and sale were matters entirely within the knowledge of its own employees, and the circumstances proved in this case were at least sufficient to make a *prima facie* case and shift to appellee the burden of proving that there was no negligence in this respect. It is not a case where the thing speaks for itself so as to create a presumption of negligence, but there are circumstances which warrant such an inference and casts upon appellee the burden of clearing itself of the charge by showing that ordinary care was observed in the preparation and distribution of the food, the consumption of which caused the injury complained of. *Southwestern Tel. & Tel. Co.* v. *Bruce,* 89 Ark. 581; *Commonwealth Public Service Co.* v. *Lindsay,* 139 Ark. 283; *Chiles* v. *Fort Smith Commission Co.,* 139 Ark. 489.

Our conclusion, therefore, is that the court erred in taking the case from the jury, and the judgment is reversed and the cause remanded for a new trial.

HART, J. I dissent from that part of the opinion which holds that there is no privity of contract between the manufacturer of canned goods and of those put up in

sealed packages, and the ultimate consumer. Canned goods and sealed packages prepared by the manufacturer for use of the consumer are in such common and universal use at the present time that we may judicially know that the contents are sealed up not to be opened until they are used and they are not then susceptible to any practical test except the one of eating. When the manufacturer puts such goods upon the market for sale and consumption, he in effect represents to each purchaser that the contents of the can or sealed package are sound and fit for food. Under these circumstances there is no room for the fundamental condition upon which the common law doctrine of *caveat emptor* is based; for the buyer has no opportunity to look out for himself. It is obvious that in cases of this kind the retailer is generally free from fault, and sound public policy, with due regard to the public good, demands that when an article of food or medicine is prepared by a manufacturer in sealed packages and thrown into the current of trade on the faith of the public that it is what the manufacturer represents it to be, there is an implied warranty that it is sound and fit for the purpose sold and that this covenant runs with the property through any number of hands and inures to the benefit of the ultimate consumer. It is true this rule is opposed to one laid down in *Nelson* v. *Armour Packing Co.*, 76 Ark. 352, but a careful consideration of that opinion leads one to the conclusion that it is unsound and the rule laid down is wholly unsuited to the conditions existing at the present time. There is no rule of property in that case, and no reason exists why it should not be overruled if unsound. The opinion itself shows that the line of cases directly in point on the subject were not considered.

I also think the opinion is cloudy upon what is necessary for the plaintiff to prove in an action for negligence in such cases. The Federal Act of June 30, 1906, prohibits interstate shipments of adulterated foods or drugs and makes a violation of the act a misdemeanor.

One section of the act defines adulteration in the case of meats as consisting "in whole or in part of a filthy, decomposed, or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter."

The Federal Act of March 4, 1907, provides that any person who shall "sell or offer for sale or transportation for interstate or foreign commerce any meat or meat food products which are diseased, unsound, unhealthful, unwholesome, or otherwise unfit for human food, knowing that such meat food products are intended for human consumption, he shall be guilty of a misdemeanor."

This statute was passed for the protection or benefit of the ultimate consumer and the manufacturer is liable to him for damages resulting from his failure to comply with the statute. Therefore, a *prima facie* case is made out for the plaintiff by proof that the meat was sold in the original package, was diseased, and caused the death of plaintiff's wife.

Justice HUMPHREYS concurs.